Filed 4/3/24  P. v. Onley CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B323411 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. BA387967 |
| MICHAEL J. ONLEY, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, George G. Lomeli, Judge. Affirmed.

Nancy L. Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

Defendant Michael Onley appeals from the trial court's order denying his petition to vacate his first degree murder conviction and resentence him under Penal Code[1] section 1172.6.[2] After issuing an order to show cause and holding an evidentiary hearing, the court found Onley could be convicted of murder under a currently-valid theory of felony murder because he was a major participant who acted with reckless indifference to human life during the underlying burglary and robbery in which the victim was killed. On appeal, Onley contends insufficient evidence supports the court's major participant and reckless indifference findings. We affirm.

## FACTUAL BACKGROUND[3]

### The Prosecution's Case-in-Chief

### 1.     The Burglary, Robbery, and Shooting

In January 2011, Diaz and Onley were living together, and Diaz was dating Porscha Chambers. On January 22, 2011,

---

[1] All undesignated statutory references are to the Penal Code.

[2] Onley filed his petition for resentencing under former section 1170.95, which the Legislature later renumbered to section 1172.6 without substantive change. (Stats. 2022, ch. 58, § 10.) We hereafter cite to section 1172.6 for ease of reference. This is Onley's third appeal relating to the same conviction. (See *People v. Diaz* (Apr. 15, 2016, B258629) [nonpub. opn.] (*Diaz*); *People v. Onley* (Jan. 10, 2019, B281919) [nonpub. opn.] (*Onley*).)

[3] The factual summary is taken largely from our prior nonpublished opinion in *Diaz*. We have omitted some facts that were included in that opinion and added others that are relevant to this appeal, including a section discussing the gang-related evidence presented at trial. Onley,

Chambers went to Diaz and Onley's apartment. Ryan Whitmore, whom Diaz had met earlier that day, was also at the apartment. Diaz, Chambers, and Whitmore decided to go to a party. Diaz drove them to a gas station, where they met Cherry. While Diaz and Cherry talked, Chambers went to a store across the street to buy a bottle of alcohol. Diaz, Chambers, and Whitmore then went to Cherry's house to hang out before the party.

Cherry lived by himself, but he owned a parrot that talked. He sold clothes, electronics, and marijuana out of his house. When they arrived at Cherry's house, Chambers, Diaz, and Whitmore drank alcohol and smoked marijuana, and Whitmore also smoked Phencyclidine (PCP).

While at Cherry's house, Chambers allowed Diaz to use her phone to make several calls. Diaz became fidgety after using Chambers's phone. Diaz then asked Chambers to go to the store to buy some blunts so that they could smoke marijuana. When Chambers returned about five minutes later, Diaz asked her to go back outside to grab something from his car, which was parked near Cherry's house. When she went outside, Chambers saw Onley and Moore standing under a tree.

Chambers then received a call from Onley, who asked for Diaz. Chambers replied that Diaz was inside Cherry's house. Onley and Moore then pulled hoods over their heads and walked toward the house. As Onley and Moore approached the house, Whitmore was trying to leave through the front door. Onley and Moore tried to pull her inside the house with them, but she broke

Octivan Moore and Donivan Diaz were tried by the same jury for the death of Andrew Todd Cherry.

free. Onley and Moore then entered the house and closed the front door.

While Whitmore was outside, she heard what sounded like popping balloons, firecrackers, or gunshots. She then ran away from Cherry's house, and Chambers tried to follow her. Chambers eventually stopped following Whitmore and returned to Diaz's car. She then saw Diaz, Onley, and Moore leave the house. As they left the house, Onley and Moore were carrying white bags or pillowcases that appeared to be stuffed with items. Diaz returned to his car, and Onley and Moore got into a different car. Diaz and Chambers then went looking for Whitmore. They found her outside of a nearby church, and Diaz told her to get into his car.

Diaz then drove Chambers and Whitmore to a party. Chambers and Whitmore stayed in the car while Diaz went inside for about 15 minutes. After leaving the party, Diaz dropped Whitmore off at a house and drove Chambers and himself to a motel room, where they met Moore who was with an unknown woman. After about 45 minutes, Moore and the woman left the motel room, and Diaz and Chambers stayed in the room until the next morning.

After leaving the motel, Chambers told Diaz that she was worried that her fingerprints would be found inside Cherry's house. Diaz told her not to worry because he had "got it already." During another conversation after they left the motel, Diaz told Chambers that he had returned to Cherry's house on January 23, 2011 and found Cherry lying face-down on the ground. He also told her that "they" had robbed Cherry, that he had Cherry's computer, and that "they" had killed Cherry's bird because it talked too much.

4

**2. The Discovery of Cherry's Body**

On Monday, January 24, 2011, Cherry's sister, brother-in-law, and brother went to Cherry's house because they hadn't heard from him for several days. All doors to Cherry's house were locked, so Cherry's brother and brother-in-law forced open the front door. They found Cherry, non-responsive, lying face down in a puddle of blood in the living room, near the front door. Cherry's hands were tied behind his back and his feet were bound by a jump rope. Cherry had suffered seven gunshot wounds: four to the back of his head, one to his neck, and two to his legs. Nine expended .22-caliber bullet cartridges were found near Cherry's body and throughout his living room. Blood had pooled around Cherry's body, and there was blood on the ground in the living room, the kitchen, the hallway to a bedroom, and near the front door.

Law enforcement officers found no signs of forced entry at Cherry's house, aside from the front door that Cherry's brother and brother-in-law had forced open. The inside of the house, however, looked like it had been ransacked. Some of the furniture in the living room was overturned. A computer cable in the living room had been cut and the corresponding computer was missing. A dead bird with a broken neck was found in the kitchen, and some of the bird's feathers were found in the living room. The officers also found a large amount of cocaine base, a white powder, a green leafy substance, and a digital scale in the living room.

Several fingerprints were found throughout the house. A fingerprint that matched Diaz was found on the frame to the front door, and two prints that matched Whitmore were found on

a mug inside the house. Onley's and Moore's fingerprints were not found at Cherry's house.

Cherry likely died 24 to 48 hours before his body was found.

## 3. The Investigation

### 3.1. Whitmore's Statements to the Police

A detective interviewed Whitmore about Cherry's murder. Whitmore's interview was recorded and played to the jury.

Whitmore initially denied knowing who Cherry was or having gone to his house. However, she eventually told the police that a man and a woman, whom she had met on January 22, 2011, but whose names she did not know, took her to Cherry's house to hang out, drink, smoke, and watch a movie. The man who drove her to Cherry's house was driving a gold sports utility vehicle. At some point while she was at Cherry's house, she went outside to retrieve her purse. The woman with whom she went to Cherry's house was already outside. While they were outside, Whitmore saw two men walk toward the house. The men tried to pull Whitmore back inside the house, but she pulled free and stayed outside. She then heard what she thought were gunshots from inside the house. She became scared and ran to a nearby church. The man and woman who took Whitmore to Cherry's house later found her at the church and forced her into the man's gold sports utility vehicle. They then dropped her off at an unknown location.

At the end of her interview, the police showed Whitmore a group of photographs of different men. She identified Diaz as the man who drove her to Cherry's house and forced her into his car after she left the house. On August 15, 2011, Whitmore was

6

shown another group of photographs and identified Chambers as the woman with whom she went to Cherry's house.

### 3.2.  Chambers's Statements to the Police

In August 2011, Chambers and Diaz were arrested together while Diaz was driving a gold sports utility vehicle. A detective interviewed Chambers about Cherry's murder later that day. Portions of Chambers's interview were played for the jury.

Most of Chambers's statements to the police were consistent with the testimony she later gave at trial. However, there were some differences between her statements to the police and her testimony. For example, during the beginning of her interview, she denied knowing what happened to Cherry on the night she went to his house, claiming that she left his house early because she felt sick and had started to vomit.

During the interview, Chambers stated that Diaz called Moore before Chambers saw Moore and Onley standing in Cherry's front yard. Chambers also recounted a conversation she had with Diaz the day after they went to Cherry's house, in which Diaz described what happened while he was inside the house with Onley and Moore. She said, "[Diaz] told me that they have robbed [Cherry] or whatever … [¶] He was like, you don't know the dude. No-Good, he said that he think the dude No-Good, shot him or whatever. I'm like how you don't know if you shot him or not, he's like my head was down. I'm like how you don't know? It's a sound, there's no way that you cannot hear a gunshot, you know I'm saying, so how you don't know if he dead or not? He just talking about they hurried up and made me leave."

At the end of the interview, Chambers identified Onley from a photographic lineup. She told the police that Onley was

Diaz's brother and that he was one of the two hooded men she saw enter Cherry's house on the night Cherry was killed. On September 27, 2011, Chambers identified Moore from a different photographic lineup. She identified Moore as the man called "No-Good," and she confirmed that he was the other man with Onley and Diaz on the night defendants robbed Cherry.

### 3.3. Electronic Evidence

#### 3.3.1. Onley's Electronic Monitoring Device

Onley wore an ankle monitor containing a global positioning system tracking device that the California Department of Corrections and Rehabilitation used to track his movements. The monitor was tracking Onley's movements on January 22, 2011, the night Cherry was robbed, as well as on January 23, 2011.

Around 9:07 p.m. on January 22, 2011, Onley was near a tree in front of Cherry's house. Onley then moved inside Cherry's house, where he remained from 9:10 p.m. to 9:17 p.m. Data from Onley's monitor and two of Cherry's cell phones showed that after Onley left Cherry's house, Onley and Cherry's phones travelled together in the same direction for more than an hour.

Data from Onley's monitor also showed that at around 8:18 p.m. on January 23, 2011, Onley went back to Cherry's house. Onley remained at Cherry's house until 8:30 p.m. Around 8:35 p.m., he returned to his own home a few blocks away from Cherry's house.

#### 3.3.2. Cell-Phone Records

The prosecution also introduced records for the cell phones defendants used around the time of Cherry's murder. Although defendants did not use any cell phones registered in their names,

8

statements from other witnesses established that defendants had used other people's phones to communicate with each other before and after they entered Cherry's house on January 22, 2011. Chambers testified that she had allowed Diaz to use her cell phone several times on January 22, 2011. Deserie Sherlock, who was working as a prostitute around the time of Cherry's murder, testified that a Black male had stolen her phone sometime between August 2010 and June 2011.

On January 22, 2011, around the time Moore and Onley were seen at Cherry's house, Chambers's phone received several calls from a phone number registered in Sherlock's name. On January 28, 2011, Moore's roommate received several phone calls from the phone registered in Sherlock's name.

The prosecution's cell-phone expert testified about the locations of Chambers's and Sherlock's phones on the evening of January 22, 2011. At 8:12 p.m., Chambers's phone communicated with a cell tower located near Cherry's house, and Sherlock's phone communicated with a cell tower located near Moore's house. Between 8:27 p.m. and 9:09 p.m., Chambers's phone continued to communicate with the cell towers located near Cherry's house. At 8:29 p.m., Sherlock's phone began to communicate with cell towers located near Cherry's house, and it continued to do so until 9:44 p.m. Data from Onley's ankle monitor showed that Onley was moving along the same path as Sherlock's phone.

### 3.4. Gang Evidence

A Los Angeles Police Department officer testified as the People's gang expert. The gang expert was familiar with several gangs in the South Central area of Los Angeles, including the 51 Troubles gang. The 51 Troubles' primary activities included

producing and selling narcotics, and committing burglaries, robberies, shootings, and "lots of murders."

Onley, Moore, and Diaz were members of the 51 Troubles, and they were active in the gang when Cherry was killed. Based on a hypothetical similar to the facts of this case, the expert opined that the crimes were committed for the benefit of the 51 Troubles. The expert also opined that the participating gang members would be expected to back each other up in every aspect of committing the crimes, regardless of whether the crimes were "premeditated or preplanned" or spontaneous.

**Defense Evidence**

**1.    Cherry's Neighbors**

Defendants introduced the testimony of several of Cherry's neighbors who either claimed to have seen Cherry alive, or heard sounds like fireworks or gunshots in the neighborhood, on January 23, 2011, the day after defendants robbed Cherry. Linda Page, who lived on Cherry's street, had grown up with Cherry, his brother, and defendants. Although Cherry and his brother were twins, she could tell them apart. She saw Cherry and another woman at a liquor store near Cherry's house around 11:00 p.m. on January 23, 2011. Cherry bought her a beer.

Lucy Gardner was also one of Cherry's neighbors. She had known Cherry since he was a teenager. She thought of him like her "son," and Cherry would often refer to her as "Momma Lucy." She also could tell Cherry and his brother apart. She saw Cherry and another man at a liquor store around 1:00 p.m. or 2:00 p.m. on January 23, 2011. Cherry greeted her and told her that he would see her later. When Gardner returned home from the liquor store, Cherry pulled up in front of her house and said,

10

" 'Momma, I see you later on. Do you want anything?' " She replied no, and Cherry left. Cherry returned to her house around 8:00 p.m. that night to ask her if she wanted him to buy her any food.

Melba Thompson, who lived a few houses away from Cherry, heard fireworks around 9:30 p.m. or 10:00 p.m. the night before Cherry's body was found. She did not hear any firecrackers or gunshots on January 22, 2011. Thompson did not know Cherry or Chambers, but she did recognize Chambers from the neighborhood. Thompson had seen Chambers come and go from Cherry's house on several occasions. She also saw Chambers ride by Cherry's house in a car with hydraulics on the morning of January 23, 2011.

Freddie Williams, another one of Cherry's neighbors, told the police that he had seen Cherry in front of Cherry's house between 10:00 a.m. and 11:00 a.m. on January 23, 2011.[4] Cherry, who was with another man at the time, invited Williams to his house for a beer.

## 2.    Expert Testimony

Diaz called Ronald Markman, a psychiatrist, who testified about the potential effects of PCP, marijuana, and alcohol on a person's memory and mental acuity. Dr. Markman testified that PCP can distort a person's emotions and ability to think,

---

[4] Freddie Williams was unable to testify because he died before trial. His statements were introduced through Detective Mun's testimony. Detective Mun testified that at the time he interviewed Williams shortly after Cherry's body was discovered, Williams's speech was slightly slurred and there were several prescription medication bottles in Williams's home.

perceive, and act. Specifically, PCP can cause a person to suffer hallucinations and delusional thoughts. PCP can also produce conditions that "mimic" schizophrenia. Depending on a person's history of using PCP and the concentration of PCP used on a particular occasion, the drug can significantly affect that person's ability to accurately perceive what is going on around her. Dr. Markman also testified that using marijuana can negatively affect a person's short-term memory. Finally, Dr. Markman testified that drinking a pint of gin could affect a person's ability to perceive and remember events. However, he also testified that the extent to which a person's perception and memory would be impaired by consuming alcohol on a particular occasion depends on that person's history of consuming alcohol. If the person frequently drinks, she will develop a higher tolerance to alcohol, and the amount of alcohol needed to impair her perception and memory will increase.

## PROCEDURAL BACKGROUND

### 1. The Trial

In 2014, the People charged Onley, Diaz, and Moore with Cherry's murder (§ 187, subd. (a)). The information alleged each defendant committed the murder while engaged in the crimes of robbery and burglary (§ 190.2, subd. (a)(17)(A) & (G)) (felony-murder special circumstance allegation). As to each defendant, the information alleged a principal personally and intentionally discharged a firearm in the commission of the murder (§ 12022.53, subds. (d) & (e)(1)) and that the murder was committed for the benefit of a street gang (§ 186.22).

The jury found each defendant guilty of murder, and it found true as to each defendant the felony-murder special

12

circumstance allegation and the firearm allegation. The jury found not true the gang allegation as to each defendant.

In August 2014, the court sentenced Onley, Diaz, and Moore each to a term of life in prison without the possibility of parole. The court vacated the firearm use allegation and ordered each defendant to pay a $300 parole revocation restitution fine under section 1202.45. As to each defendant, the court stayed its restitution order. Defendants appealed.

## 2.  The First Appeal

In *Diaz*, we affirmed Diaz's and Moore's convictions. Although we concluded substantial evidence supported Onley's conviction for first degree murder and rejected several of Onley's other claims of error, we reversed Onley's conviction after concluding the court abused its discretion in denying his motion to represent himself at the sentencing hearing under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta* motion). We remanded the matter for a new hearing on Onley's *Faretta* motion and directed the court to strike each defendant's parole revocation restitution fine.

## 3.  The Second Appeal

After the remittitur issued in *Diaz*, the trial court granted Onley's *Faretta* motion. Onley filed a motion for a new trial, arguing, among other things, that the People failed to disclose exculpatory evidence and the prosecutor committed misconduct during her closing argument. The court denied Onley's new trial motion, resentenced him to life in prison without the possibility of parole, and re-imposed a $300 parole revocation restitution fine.

Onley appealed. We affirmed Onley's judgment and directed the court to strike his parole revocation restitution fine.

## 4. The Resentencing Petition

In April 2021, Onley filed a resentencing petition under section 1172.6. Onley alleged: (1) he was charged with murder under a felony murder or natural and probable consequences theory; (2) he was convicted of murder under one of those theories; (3) he was not the actual killer; and (4) he could not be convicted under a currently-valid theory of murder. Onley also asked the court to appoint counsel to represent him.

After appointing counsel for Onley, the court found he made a prima facie showing of eligibility for resentencing. The court issued an order to show cause and scheduled an evidentiary hearing under section 1172.6, subdivision (d).

### 4.1. Onley's Testimony at the Evidentiary Hearing

Onley testified at the evidentiary hearing. Onley used to live at his mother's house, which was near Cherry's house. On January 22, 2011, the day Cherry was killed, Onley got home from work around 7:00 p.m. He went to Moore's house to buy marijuana, but Moore wasn't home. Onley returned home before deciding to go to Cherry's house to buy marijuana. On his way there, Onley ran into Moore.

Onley and Moore reached Cherry's house around 9:30 p.m. At the time, Onley was wearing a t-shirt; he was not wearing a hooded sweatshirt. As Onley and Moore approached the front door, they saw Whitmore leaving the house. Whitmore bumped into them as she stepped out of the front door.

When Onley and Moore went inside the house, Diaz and Cherry were sitting in the living room. Onley bought some

marijuana from Cherry and immediately left the house, while Diaz and Moore stuck around. According to Onley, it was still around 9:30 p.m. when he left Cherry's house.

After returning to his mother's house, Onley borrowed another person's car and drove to his friend's house to smoke marijuana. Around 9:42 p.m., Onley smoked marijuana on his friend's porch before returning to his mother's house.

Around 8:00 p.m. on January 23, 2011, Onley went back to Cherry's house to buy more marijuana. According to Onley, Cherry was still alive, and he sold marijuana to Onley.

On January 24, 2011, Onley learned that Cherry had been murdered.

Onley denied seeing Chambers outside Cherry's house or speaking to her on the phone on the evening of January 22, 2011. He also denied leaving Cherry's house with a pillowcase full of items or getting into a vehicle with anyone outside of Cherry's house that night.

### 4.2.   The Court's Ruling

The court denied Onley's petition. The court found Onley's testimony lacked credibility because it contradicted much of the evidence presented at trial. The court then applied the factors outlined in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) and found the People proved beyond a reasonable doubt that Onley was a major participant in the underlying robbery and burglary who acted with reckless indifference to human life. Thus, the court concluded, Onley was ineligible for resentencing under section 1172.6.

Onley appeals.

15

# DISCUSSION

## 1.   Applicable Law

### 1.1.   Senate Bill. No. 1437 (S.B. 1437) and Section 1172.6

S.B. 1437 limited accomplice liability under the felony murder rule and eliminated the natural and probable consequences doctrine to ensure a person's sentence is commensurate with his or her culpability. (*People v. Gentile* (2020) 10 Cal.5th 830, 842–843; see also *People v. Strong* (2022) 13 Cal.5th 698, 707–708 (*Strong*).)

S.B. 1437 also added section 1172.6, which provides people who have been convicted of murder under one of the now-invalid theories the opportunity to petition for resentencing. (See § 1172.6; *Strong*, *supra*, 13 Cal.5th at p. 708.) A petitioner is eligible for relief under section 1172.6 if (1) the complaint or information allowed the prosecution to proceed under a felony murder theory; (2) the petitioner was convicted of murder "following a trial or accepted a plea offer in lieu of a trial at which the petitioner could have been convicted" of murder; and (3) the "petitioner could not presently be convicted" of murder "because of changes to Section 188 or 189." (§ 1172.6, subd. (a).)

If the petitioner files a facially sufficient petition, the court must appoint counsel. (§ 1172.6, subd. (b)(3).) And, if the petitioner makes a prima facie showing of entitlement to relief, the court must issue an order to show cause. (*Id.*, subd. (c).) The parties may stipulate that the petitioner is eligible for resentencing. (*Id.*, subd. (d)(2).) Or if there was a prior finding by a court or jury that the petitioner did not act with reckless indifference to human life or was not a major participant in the

16

felony, the court shall vacate the petitioner's conviction and resentence the petitioner. (*Id.*, subd. (d)(2).) Otherwise, the court must hold an evidentiary hearing at which the prosecution bears the burden to prove beyond a reasonable doubt that the petitioner is guilty of murder or attempted murder under current law as amended by S.B. 1437. (*Id.*, subd. (d)(3).) "If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (*Ibid.*)

We review the trial court's factual findings following a section 1172.6, subdivision (d) hearing for substantial evidence. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298, 301.) We review the entire record in the light most favorable to the court's order to determine whether any rational trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.) Thus, before we may set aside the court's order, it must be clear that " ' "upon no hypothesis whatever is there sufficient evidence to support [it]." ' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

### 1.2. *Banks* and *Clark*

S.B. 1437 amended section 189's definition of felony murder by incorporating section 190.2, subdivision (d)'s requirements for proving a felony-murder special-circumstance allegation. (See *Strong, supra,* 13 Cal.5th at p. 708.) Now, to support a felony-murder murder conviction, the People must prove that the killing was committed in the perpetration of, or during an attempt to perpetrate, one of several enumerated felonies, including robbery and burglary, and that the defendant either: (1) "was the actual killer;" (2) "was not the actual killer, but, with the intent to kill,"

17

aided and abetted the killer in the commission of the murder; or (3) "was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subds. (a) & (e).)

In *Banks* and *Clark*, the California Supreme Court clarified what it means for a defendant to be a major participant in the underlying felony who acted with reckless indifference to human life. (*Banks*, *supra*, 61 Cal.4th at p. 803 [discussing major participant factors]; *Clark*, *supra*, 63 Cal.4th at pp. 618–623 [discussing reckless indifference factors].) In doing so, the court looked to the United States Supreme Court's decisions in *Enmund v. Florida* (1982) 458 U.S. 782 and *Tison v. Arizona* (1987) 481 U.S. 137, which "place[d] conduct on a spectrum, with felony-murder participants eligible for death only when their involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions." (*Banks*, at p. 794; see also *Clark*, at p. 616 [acknowledging *Tison* as "the source of the language of section 190.2, subdivision (d)"].)

In *Banks*, the court identified the following factors for determining whether a defendant was a major participant in the underlying felony: (1) the role the defendant played in planning the target crime that led to the victim's death; (2) the role the defendant played in supplying or using lethal weapons; (3) the defendant's awareness of the particular dangers posed by the nature of the crime, the weapons used, or the past experience or conduct of the other participants; (4) whether the defendant was present at the scene of the killing and, if so, whether he was in a position to facilitate or prevent the death; (5) whether the defendant's actions or inactions at the scene of the killing played a particular role in the victim's death; and (6) the defendant's

18

conduct after lethal force was used. (*Banks, supra,* 61 Cal.4th at p. 803.) None of these factors is necessary, nor is any one necessarily sufficient, to establish the defendant was a major participant. (*Ibid.*)

In *Clark,* the court explained that reckless indifference "encompasses a willingness to kill (or to assist in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark, supra,* 63 Cal.4th at p. 617.) Reckless indifference includes a subjective and an objective element. (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*).) For the subjective element, " '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' " (*Ibid.*) To satisfy the objective element, " ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' " (*Ibid.*)

*Clark* identified the following factors to be considered in determining whether a defendant acted with reckless indifference to human life: (1) the defendant's awareness that a gun or other weapon would be used during the target offense; (2) the defendant's presence at the crime and whether he had an opportunity to prevent the crime or aid the victim; (3) the duration of the felony, including how long the defendant and the victim interacted before the killing; and (4) the defendant's apparent efforts to reduce the risk of violence during the

commission of the target offense. (*Clark*, *supra*, 63 Cal.4th at pp. 618–623; *Scoggins*, *supra*, 9 Cal.5th at p. 677.)

The reckless indifference factors " 'significantly overlap' " with the major participant factors, " 'for the greater the defendant's participation in the felony murder, the more likely he acted with reckless indifference to human life.' " (*Clark*, *supra*, 63 Cal.4th at p. 615.) Like the major participant factors, none of the reckless indifference factors is necessary, nor is any one of them necessarily sufficient, to establish the defendant acted with reckless indifference. (*Scoggins*, *supra*, 9 Cal.5th at p. 677.) In weighing these factors, courts must consider the totality of the circumstances. (*Ibid*.)

In *Strong*, the Supreme Court addressed whether a jury's pre-*Banks* and *Clark* felony-murder special circumstance findings, like the ones at issue here, have any preclusive effect on a resentencing petition under section 1172.6. The court held that neither a jury's pre-*Banks* and *Clark* felony-murder special circumstance findings, nor a court's sufficiency of the evidence review applying the *Banks* and *Clark* standards to a jury's pre-*Banks* and *Clark* felony-murder special circumstance findings, preclude a petitioner from making a prima facie showing under section 1172.6. (*Strong*, *supra*, 13 Cal.5th at pp. 715–720.)

2.  **Substantial evidence supports the court's finding that Onley was a major participant in the underlying felonies who acted with reckless indifference to human life.**

    **2.1. Major Participant**

    Applying the factors described in *Banks*, we conclude substantial evidence supports the court's finding that Onley was a major participant in the underlying robbery and burglary.

20

Evidence supports an inference that Onley helped plan the crimes. Before Onley and Moore arrived at Cherry's house, Diaz used Chambers's phone to make several calls. Diaz then became "fidgety." After Diaz used her phone, Chambers went outside and saw Onley and Moore standing together in Cherry's front lawn. Onley then called Chambers's phone and asked for Diaz. When Chambers told Onley that Diaz was inside Cherry's house, Onley and Moore pulled hoods over their heads, walked toward the front door, and entered the house. This evidence supports an inference that Diaz coordinated with Onley and Moore to rob Cherry before they arrived at his house, and Onley called Diaz before entering the house to confirm that Diaz was present.

Evidence also supports an inference that Onley was present when Cherry was killed. Whitmore heard gunshots come from inside Cherry's house after Onley and Moore entered the house. Diaz later told Chambers that Moore shot Cherry during the robbery. According to Diaz, "they"—i.e., Moore and Onley— "hurried up and made [him] leave" after Cherry was shot.

There also was evidence that Onley was in a position to either prevent the killing or aid Cherry after he was shot. Cherry's body was found in the living room, near the front door, with his arms and legs bound and several gunshot wounds to his head, neck, and legs. Although Onley would have seen Cherry as he walked out of Cherry's house, nothing in the record indicates Onley tried to free Cherry from his restraints before or after he was shot or otherwise tried to aid Cherry. Instead, Onley and Moore told Diaz to "hurr[y] up" once Cherry was shot, and Onley later walked out of Cherry's front door carrying a bag full of items, indicating he continued to rob Cherry after the shooting.

21

To be sure, the People didn't present evidence that Onley supplied the gun used to kill Cherry or that Onley was aware lethal force would be used in the underlying crimes. And while the People presented evidence that Onley, Moore, and Diaz were in the same gang, and that their gang was known for committing, among other crimes, "shootings" and "lots of murders," the People did not present evidence showing Onley had participated in violent crimes with Moore or Diaz or was otherwise aware Moore or Diaz were likely to use lethal force during the crimes. (See *Banks*, *supra*, 61 Cal.4th at pp. 810–811 [evidence that the defendant and some of his cohorts were in a gang known for " 'robberies, shootings, attempted murders, [and] murders' " did not establish the defendant was aware his cohorts previously engaged in shootings or lethal violence without evidence that defendant or his cohorts "participated in shootings, murder, or attempted murder"].) Nevertheless, the absence of such evidence is outweighed by Onley's participation in the planning and execution of the robbery and burglary, his presence at the scene of the killing, and his continued participation in the underlying crimes after Cherry was shot. (See *People v. Nieber* (2022) 82 Cal.App.5th 458, 476–477 (*Nieber*).)

In sum, substantial evidence supports the court's finding that Onley was a major participant under the factors identified in *Banks*.

## 2.2.   Reckless Indifference

Substantial evidence also supports the court's finding that Onley acted with reckless indifference to human life under the factors outlined in *Clark*.

Onley participated in the underlying robbery and burglary and was present in Cherry's house when Cherry was killed.

(*Clark*, *supra*, 63 Cal.4th at p. 619 [a defendant's participation in the events leading up to, and his proximity to, the murder are relevant to determining whether he acted with reckless indifference to human life].) And, as we just explained, the evidence supports an inference that Onley did not do anything to try to prevent Cherry's death. Diaz told Chambers that after Moore shot Cherry, "they"—i.e., Moore and Onley—"hurried up" and made Diaz leave the house. Instead of trying to help Cherry after he was shot, Onley continued with the robbery and burglary, walking out of Cherry's house with a bag of items. (See *ibid*. [a defendant's failure to render aid to the victim while present at the scene of the killing weighs in favor of a finding of reckless indifference to human life].)

The circumstances surrounding the underlying robbery and burglary and Cherry's killing also support an inference that Onley acted with reckless indifference to human life. As our Supreme Court explained in *Clark*, "[w]here a victim is held at gunpoint, kidnapped, *or otherwise restrained in the presence of perpetrators for prolonged periods*, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Clark*, *supra*, 63 Cal.4th at p. 620, italics added.) When Cherry's body was found, his arms and legs were bound, indicating he was restrained before he was shot. As we noted above, the court could infer that Onley saw Cherry was restrained before Onley left the house, as Cherry's body was found lying near the front door. But nothing in the record indicates Onley tried to free Cherry from his restraints or otherwise minimize the risk that Cherry would be killed. (See *id.* at p. 622 [evidence that the defendant took steps to reduce the

23

risk of violence is relevant in determining whether he acted with reckless indifference to human life].)

In addition, the duration of the underlying crimes was not particularly short. Data from Onley's ankle monitor showed that he was inside Cherry's house for about seven minutes. During that time, Cherry was restrained and shot, Cherry's bird was killed, and Onley and his cohorts were able to ransack Cherry's home and leave with several pieces of Cherry's property. (See *Nieber*, *supra*, 82 Cal.App.5th at p. 479 [prolonged duration of robbery supported inference that the defendant acted with reckless indifference].) And Cherry's dead body did not deter Onley from returning to Cherry's home the day after he was killed.

Onley relies on *In re Ramirez* (2019) 32 Cal.App.5th 384, in which the appellate court overturned a felony-murder special circumstance finding because there was insufficient evidence that the defendant was a major participant in the underlying robbery who acted with reckless indifference to human life. (*Id.* at pp. 404–408.) *Ramirez* does not help Onley. Although the defendant in *Ramirez* supplied the gun that was used to kill the victim, he did so at a time when no criminal conduct was contemplated. (*Id.* at p. 404.) Unlike in this case, the robbery in *Ramirez* was not planned, and the defendant "was not at the immediate location of the killing." (*Id.* at pp. 404–405.) Further, the defendant in *Ramirez* acted only as a lookout and getaway driver, as opposed to Onley, who actively participated in the underlying crimes and was present when Cherry was killed. (*Id.* at p. 404.)

In sum, substantial evidence supports the court's findings that Onley was a major participant in the underlying robbery and burglary who acted with reckless indifference to human life. The

court, therefore, properly denied Onley's petition for resentencing under section 1172.6.

## DISPOSITION

The order denying Onley's petition for resentencing under section 1172.6 is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

LAVIN, J.

WE CONCUR:

EDMON, P. J.

EGERTON, J.